[Civ. No. 16774.   First Dist., Div. One.   Aug. 24, 1956.]

SALLY PETERSON, Respondent, v. FALCONER GEORGE CRUICKSHANK, Appellant.

Hudson, Martin, Ferrante & Street and Dunlap, Holmes, Ross & Woodson for Appellant.

Cantillon & Cantillon and Paul M. McDonough for Respondent.

PETERS, P. J.—Sally Peterson brought this action against Falconer Cruickshank, Charlotte Clapp Cruickshank, Dr. Kenneth Francis, Dr. Walter B. Layton, the Peninsula Community Hospital and the Alexander Sanitarium for compensatory and punitive damages for a claimed false imprisonment. The jury brought in a verdict of $25,000 compensatory damages against Falconer Cruickshank, Dr. Kenneth Francis and the Alexander Sanitarium but exonerated Dr. Layton, Charlotte Cruickshank, and the Peninsula Community Hospital. No punitive damages were awarded. From the judgment entered on this verdict Falconer Cruickshank alone appeals.

The complaint charges that the defendants, without legal cause or authority, caused plaintiff to be falsely imprisoned in the hospital and sanitarium between October 21, 1952, and November 8, 1952, and that the confinement was accomplished against her will by force and fear and by the administering of drugs to her, and by the application of electric shock to her head and body, all against her will.

The two main actors in the drama involved were Sally Peterson, the respondent, and Falconer George Cruickshank, the appellant. In the fall of 1952 respondent was 56, unmarried and an interior decorator. Appellant, a wealthy retired attorney in poor health, at that time was a widower of 72. The parties first met in 1941 in Pasadena, when an adopted

daughter of appellant rented a room in respondent's home. Between 1941 and 1945 the two were only acquaintances. In 1945 appellant's then wife died, and thereafter the relationship ripened into an intimate one, respondent testifying that she was in love with appellant, and that between 1947 and 1952 she had discussed marriage with appellant on several occasions.

Appellant had beneficial interests in three ranches in San Diego County which he desired to sell. In February of 1952 respondent, at the request of appellant, went to live on one of the ranches for the purpose of trying to sell all three. Respondent testified that, although she was not licensed to sell real estate, appellant promised to pay her a five per cent commission on the sales. In a period of several months respondent sold two of the ranches, one for $125,000, and also sold the cattle. Appellant paid respondent about $2,800 for these services. In addition, appellant had given respondent money and gifts on previous occasions and had purchased an automobile for her. Respondent was also hired by appellant to manage the Breeze Hill Ranch, on which she was living, at a salary of $400 per month. She testified that she expended about $1,200 of her own money in remodeling the ranch house, and that appellant agreed to reimburse her. It was respondent's testimony that all this was done pursuant to an understanding between the two that when the ranches were sold they would get married.

Appellant's version of the relationship between the parties was that, although respondent had mentioned marriage to him several times, he never had agreed to marry her, had never "courted" her, and that their relationship was purely a "business" one. He agreed that he had asked respondent to try to sell the three ranches, and that he had hired her to manage the Breeze Hill Ranch, but denied that she was to be paid a commission on the sales, because she was not an agent, although admitting he had paid her $1,800 for her trouble in selling one of the ranches, and canceled a debt of $3,200 incurred when he advanced her that sum in 1951 while she was in the east.

Between February and October of 1952 appellant lived at Pebble Beach but visited with respondent several times either at the Breeze Hill Ranch or in Los Angeles.

Respondent testified that on October 16th appellant telephoned her and the two had a violent argument; that on

October 17th appellant again telephoned her and apologized and invited her to fly up to Pebble Beach to visit him. Appellant testified that respondent telephoned him and demanded that she be invited to Pebble Beach to meet his friends. Admittedly, respondent did fly north on October 20th, and was met at the Salinas airport by appellant. Appellant testified that he suggested respondent stay at a local inn, but respondent insisted that she be permitted to stay at his home, and he acquiesced. Respondent testified that appellant invited her into his home. Admittedly, respondent was installed in the guest room of appellant's home, a bedroom that adjoined that of appellant with bathrooms between.

The evening of the 20th the two spent with appellant's adopted daughter and her family, who lived several miles from appellant. On the 21st Mrs. Charlotte Clapp, now Mrs. Cruickshank, and an exonerated defendant, came to appellant's home for lunch. She invited appellant and respondent to visit her that afternoon to see her home and for cocktails. Respondent testified that, after Mrs. Clapp left, she and appellant went for a drive and then returned to appellant's house; that she then refused to go to Mrs. Clapp's house; that appellant and respondent then began drinking; that appellant then told her that he intended to marry Mrs. Clapp; that Mrs. Clapp would make a more acceptable wife than respondent because Mrs. Clapp had a great deal of money. Respondent also testified that, during the afternoon and early evening, during which both consumed a good deal of liquor, the two heatedly discussed a financial accounting of the sums respondent claimed were owing to her.

Appellant's version of the afternoon argument differs materially from that of respondent. He testified that respondent demanded a cash settlement of $100,000 or $10,000 a year for life; that the only basis of the claim was that appellant and Mrs. Clapp both had money and respondent wanted some of it; that he refused to pay her any money; that although he was "stunned" by these demands, he did not request her to leave his home; that this argument continued for several hours.

We now come to the events occurring on the critical evening of October 21st. Here the testimony is very conflicting indeed. Respondent testified that during the evening she talked to Mrs. Clapp on the telephone and asked her to come to appellant's house; that when Mrs. Clapp arrived, in the presence of appellant, she asked Mrs. Clapp if she realized the

relationship that existed between her and appellant; that Mrs. Clapp replied: ''I don't see how you can force a man to love you if he doesn't; if he wanted to marry you he would have married you before I came into the picture''; that appellant said nothing during this argument; that respondent thereupon asked him what he meant by not making a statement, put her arm around him, and asked him, ''Have you no honor?''; that appellant said nothing; that respondent was dizzy and hysterical and began to ''reel'' around; that appellant started towards the kitchen and stated: ''She's crazy, get her out of here. I never knew the woman until she came to borrow money from me in Fallbrook. Get her out of here, she's crazy.'' The butler, Serge by name, then appeared and Mrs. Clapp said: ''She certainly is crazy; get her out of here.'' The respondent then fled to the bedroom where she started to cry hysterically; that the maid, Zoya, then came in and told her to be quiet; that she apologized to the maid; that during this period appellant walked in and out of the room several times; that when she came out of the bedroom she was confronted by two policemen, and by Vern Larsen, husband of appellant's adopted daughter; that appellant came in and said: ''She's crazy, get her out of here''; that respondent turned to the officers and said: ''If I've done anything wrong, take me out of here''; that the officers said: ''We don't want to take you''; that appellant said: ''Take her to a hospital''; that the officers said that this required a doctor; that appellant told her: ''You're going to the hospital, that's all there is to it, you're excited, I'll see you in the morning''; that respondent then lost consciousness; that the next thing she remembers was being in the Peninsula Community Hospital the next day. She denied seeing defendant Dr. Layton at appellant's home; denied attempting suicide; denied agreeing to go to the hospital, and denied that she choked or attempted to choke either appellant or Mrs. Clapp.

Appellant's testimony is to the effect that, when respondent made demands for money, he telephoned Mrs. Clapp and told her that they would not be over; that his adopted daughter and her husband had dinner with appellant and respondent; that after dinner respondent telephoned Mrs. Clapp and asked her to come over; that Mrs. Clapp arrived about 8:30 p. m.; that a violent argument took place between Mrs. Clapp and respondent over appellant's impending marriage to Mrs. Clapp; that respondent became hysterical and violent, rushed

over to appellant, threw herself on his lap, tried to choke him, and threatened to kill him; that Mrs. Clapp had then gone to the kitchen and respondent followed her; that respondent then attacked and choked Mrs. Clapp; that Serge, the butler, pulled respondent away from Mrs. Clapp and induced Mrs. Clapp to leave the house, which she did; that respondent then went to appellant's bedroom with Serge and Zoya. Appellant claims that he did not again speak to respondent that night. Appellant also testified that two deputy sheriffs, who had been summoned by Mrs. Clapp, arrived on the scene; that respondent rushed from the bedroom screaming and threw herself on the floor in front of the officers; that one of the officers picked her up, carried her into her bedroom and left her with Zoya; that appellant then told the officers what had happened; that at appellant's request one of the officers, after unsuccessfully trying to get appellant's regular doctor, telephoned Dr. Layton, one of the exonerated defendants; that Dr. Layton arrived shortly thereafter and went into the bedroom to see respondent; that he then came out and told appellant that respondent refused to go to the county hospital and had no funds to go to a private hospital; that Dr. Layton asked him if he would defray respondent's expenses at a private hospital, and appellant agreed to do so; that respondent then left the house by ambulance for the Peninsula Community Hospital in Carmel; that he had not seen or communicated with respondent since then until the time of trial.

Mrs. Cruickshank, who had married appellant on December 13, 1952, corroborated her husband in most respects. She testified that she came to appellant's house that night after respondent had telephoned and asked her to come over; that respondent then told her that she was in love with appellant, had known him intimately for six years and had been living with him; that she replied that she knew all about it; that respondent had then stated that appellant loved her and not Mrs. Clapp and was marrying Mrs. Clapp only because of her money; that respondent then threatened to smear Mrs. Clapp's name in the newspapers in a scandal; that when respondent repeated that she and appellant were in love, Mrs. Clapp replied: "Well, why didn't you get married? What was to prevent your getting married?"; that respondent became hysterial, and ordered Mrs. Clapp out of the house; that when she refused to leave respondent jumped on appellant's lap, started to choke him and shouted that she was going to kill herself and appellant; that she then ran towards

the kitchen for help and was followed by respondent, who attempted to strangle her; that Serge grabbed respondent and pulled her off; that respondent pulled off the witness' necklace and attempted to kick her; that she telephoned the deputy sheriff and told him to come over because there was a "crazy woman" in the house, and they needed help; that respondent had then pulled the telephone out of her hand and out of the wall socket; that the witness then fled from the house and waited outside for the arrival of the officers; that she had to have her throat treated by a doctor.

Serge, the butler, testified that the night in question he heard arguing in the living room and then Mrs. Clapp came running in the kitchen yelling "we have a crazy woman in the house"; that respondent then ran into the kitchen, told Mrs. Clapp to go home, and started to choke and kick Mrs. Clapp; that later he saw marks on Mrs. Clapp's throat; that he restrained respondent and suggested to Mrs. Clapp that she go home, and shortly thereafter Mrs. Clapp left; that respondent then went into appellant's bedroom and laid down, acting sorry and disgusted. He corroborated appellant as to what happened after the officers arrived, and testified that after respondent had returned to her bedroom with the maid Zoya, the maid came rushing back to the living room saying that respondent had pretended to or did take some sleeping pills; that shortly thereafter Dr. Layton arrived and took respondent away in an ambulance; that respondent looked unconscious when she was carried out.

Zoya, the maid, corroborated, in substance, the butler, who was her husband, as to what had happened in the kitchen, and then testified that after she escorted respondent to her bedroom respondent told her how much she loved appellant and how miserable she was; that after respondent had thrown herself in front of the officers, she again assisted her to her bedroom; that respondent got up from the bed and went into the adjoining bathroom, leaving the door open; that she saw respondent make a gesture towards her mouth, and when Zoya asked her what she had done, respondent replied: "Oh, never mind, I want to die." Zoya had the impression that respondent had taken some pills, although she had not seen any. The witness rushed into the living room and told those there what had happened, and the doctor was called. When the doctor arrived he asked respondent who she was and she replied: "Mrs. Cruickshank."

The deputy sheriffs testified that they had received a telephone call from Mrs. Clapp telling them a woman had gone insane at the Cruickshank residence; that they met Mrs. Clapp outside the house and she told them what had happened and showed them the marks on her throat; that when they went into the house respondent was hysterical and threw herself on the floor and lost consciousness; that after they assisted respondent to her bedroom, where they left her with Zoya, they returned to the living room where appellant told them that respondent was his ranch foreman who evidently, from overwork, had had a nervous breakdown. One of the officers suggested that a doctor be called, and, after several attempts, they finally got in touch with Dr. Layton, who promised to come right over.

The deputies corroborated Zoya's story about the pills, and testified that they remained at the house until respondent was removed on a stretcher. At no time did they arrest respondent, nor did appellant request them to do so. Appellant and the officers agreed with Dr. Layton that respondent should go to a hospital. In their opinion neither appellant nor respondent was intoxicated during these events, but respondent was hysterical and irrational.

Mr. Vernon Larsen, son-in-law of appellant, testified that appellant telephoned him about 8:15 p. m. and asked him to come right over. He generally corroborated the other witnesses, other than respondent, as to what had happened after his arrival.

Defendant Dr. Layton, who was exonerated by the jury, testified that he responded to a telephone call from one of the officers and arrived at the house about 9:10 p. m.; that he was told that respondent had attempted suicide and had threatened appellant; that he then went into the bedroom and examined respondent; that respondent was conscious and admitted that she had taken four or five seconal sleeping pills and an undisclosed number of codeine tablets, and that Zoya also told him that respondent had taken some sleeping pills; that respondent was semi-hysterical and drowsy, but her blood pressure, pupil dilation, reflexes and pulse were normal; that she was rational and oriented, but crying; that he gave her some caffeine and sodium benzoate to counteract the drugs. It should be here noted that one of the deputy sheriffs testified that when Dr. Layton came out of the bedroom he said that respondent was in an emotional state and that he would give her a sedative. Dr. Layton then testified that respondent

had agreed to go to the Peninsula Community Hospital so he asked appellant if, as her employer, would he "stand behind the bills"; that appellant agreed to do so; that he thereupon called an ambulance and had respondent removed to the Peninsula Community Hospital, where she arrived at 10 p. m.; that he notified the sheriff's office of the suicide attempt; that he believed her removal to the hospital was necessary for her proper care, and preservation of her life.

Although, as already pointed out, respondent denied consenting to go to the hospital, and, in fact, denied seeing Dr. Layton on the 21st, claiming to have blacked out after the officers arrived, in view of the fact that the jury absolved Dr. Layton and the Peninsula Community Hospital of the false imprisonment charge, the unlawful restraint, if any existed, occurred after the night of October 21st.

Dr. Layton, upon respondent's admission to the hospital, ordered private nurses around the clock with orders not to leave the patient alone and "restraints if necessary." He testified that this simply meant to keep her from falling out of bed and did not mean to restrain her from leaving the hospital, if she so desired. He also ordered caffeine and dexadrine, both stimulants, to be administered. On the morning of October 22d he found the patient to be quiet, but uncooperative, refusing to give him a case history or the names of members of her family. He believed that respondent was still dangerous to herself at that time, and needed a psychiatrist. He called in for consultation defendant Dr. Kenneth Francis, an M. D. and psychiatrist. That evening and on the morning of the 23d he ordered sedatives for respondent.

Dr. Francis, one of the nonappealing defendants against whom a judgment in favor of respondent was entered, testified that he was called into the case on the morning of October 22, 1952; that when he interviewed respondent she was alert and able to answer questions; that she carried on at length as to how she was going to kill appellant, and also spoke of suicide; that she told him she had a gun in a suitcase in the Cruickshank home; that he had "someone" call the home and it was discovered that a gun was where she said it was; that respondent told him about her affair with appellant, and also admitted that six years prior she had attempted suicide while emotionally disturbed and depressed; that respondent was reserved and hostile, and demanded to be immediately released so she could revenge herself on appellant; that respondent ex-

pressed hatred for the members of her family, which indicated to the doctor a paranoid state. Dr. Francis also learned from Dr. Layton about the events leading up to the hospitalization. He diagnosed respondent's condition as a severe depression, but not psychotic or insane. She was, however, in his opinion, mentally ill, a danger to herself and others and not safe to be released. Dr. Francis then testified that he submitted to respondent three alternatives—(1) be released to her family; (2) if she insisted on being released without supervision he would have to notify the police of her threats; or (3) go to a sanitarium. In spite of her mental condition the doctor believed that she could make a sound decision. He recommended to her that she go to a sanitarium and undergo shock treatments. The doctor testified that at first respondent refused to consent to go to the sanitarium but later agreed to do so.

Dr. Francis on October 23d telephoned and wrote to respondent's sister in Los Angeles, telling her that respondent was ill, had made threats of suicide and murder, needed psychiatric treatment on an out-patient basis, that as first-aid treatment she needed shock treatments, and had consented to go to the sanitarium, and asked her to sign the necessary consent to the shock treatments. He "probably" told Mrs. Webb that respondent should not then be released to her care.

On October 23, 1952, respondent, after being first given a sedative, was transferred to the Alexander Sanitarium at Belmont. This sanitarium is also a nonappealing defendant against whom a judgment was entered. At the sanitarium further sedatives were administered and suicidal precautions taken.

Mr. and Mrs. Webb came north and arrived at Dr. Francis' office in Monterey on October 25th. He testified that Mrs. Webb gave him a long history of respondent's moods and depressions and past love affairs; that Mrs. Webb was not anxious to undertake the care of respondent; that they talked about shock treatments, but no decision was then made; that he refused to give the shock treatments unless Mrs. Webb or respondent consented; that on October 26th respondent's condition worsened and he ordered sedation. He admitted that the first shock treatment was given on October 29th, without having secured the consent of Mrs. Webb, but claimed to have secured respondent's written consent. He denied that Mrs. Webb had refused consent until she could consult respondent's regular physician in Pasadena, and stated that Mrs.

Webb was in accord with his recommendation about the shock treatments but was simply reluctant to give her consent to them.

Dr. Kowalski, a psychiatrist at the sanitarium, testified that he examined respondent upon her admission on the 23d; that she was then extremely depressed; that she admitted to him she had swallowed some medication; that in his opinion the patient was so depressed as to be a danger to herself. He also testified that on October 26th respondent freely and voluntarily signed a consent to the shock treatments after discussion with him; that although she was then depressed she knew what she was doing.

Mrs. Webb's testimony conflicts in several material respects with that of Dr. Francis and Dr. Kowalski. She testified that on October 23d when Dr. Francis telephoned he told her that respondent could not be released to her but that it was "imperative that she go to a sanitarium"; that during this conversation she asked Dr. Francis not to give the shock treatments until she consulted with respondent's personal physician; that on October 24th she received a letter from Dr. Francis informing her that respondent had been transferred to the sanitarium; that she came north on October 25th and met Dr. Francis in Monterey; that Dr. Francis then refused her offer to take respondent home; that he told her that the disturbance of October 21st had not been placed on police records; that he was sure that this had been taken care of, he thought, by appellant. Mrs. Webb also testified that on October 26th, Sunday, she visited her sister at Belmont and found her calm and normal except that she cried occasionally; that respondent was not then vague or confused, but was rational and lucid; that she was asked by the superintendent of the sanitarium to sign the consent to the shock treatments, but she refused until she could talk the matter over with respondent's personal physician; that she told the superintendent that she would do so immediately upon returning home and would phone the sanitarium on Tuesday; that she did telephone Dr. Francis on Tuesday and told him that she had decided against the shock treatments; that Dr. Francis became highly indignant at this news and told her that they had started the shock treatments on Sunday, October 26th, because, shortly after Mrs. Webb had left the sanitarium, respondent had become violent. This statement by Dr. Francis was false, because, although respondent signed a "consent" to the treatments on the 26th, they were not started until the

29th. Thus, when Mrs. Webb phoned on the 28th and stated her refusal to consent, the treatments had not yet started. Mrs. Webb also testified that she had seen her sister several weeks before October 21st and that at that time she had been in excellent health, but that when her sister was discharged from the sanitarium on November 8th, she was vague, confused and extremely upset. Penicillin had been injected into respondent and this had caused a serious infection. Respondent's back was very painful and she was nervous and in an emotional state for many months thereafter.

Respondent denied that she had consented to go to the hospital or to the sanitarium. She also testified that she had not paid any of the bills. Admittedly, appellant paid Dr. Layton, Dr. Francis, the hospital, the sanitarium, and the ambulance bills. Respondent also testified that at both the hospital and the sanitarium she received medication which kept her "sleepy" "all of the time"; that at the sanitarium she was given a penicillin shot in the hip although she protested that she was allergic to this drug; that, as a result, her hip became infected and painful; that at the sanitarium she was given a series of electric shock treatments (admittedly, seven such treatments) to which she did not consent; that these treatments caused her to become unconscious, caused her to break a tooth, and tore the nerves from the back of her spine; that these injuries crippled her until February of 1953; that until then she was unable to turn over in bed or to walk straight, to hold her head up, or to sit down; that she suffered humiliation and embarrassment and pain because of such injuries; that prior to October 21st she never had had any mental illness or disease and was in excellent health; that after the shock treatments her memory and ability to coordinate her thoughts were impaired. She admitted that on October 26th, shortly after her sister and her husband had left, she signed a "Request for Insulin, Electric Shock or Conditioned Reflex Treatment," but testified that she was forced to do so by Dr. Hendricks, another doctor at the sanitarium; that Dr. Hendricks told her: "We're giving you shock treatments in the morning and its a matter of course that you sign this paper. Your sister has already taken care of the treatments"; that she told the doctor: "But I don't want shock treatments"; that he replied: "Well, it's already been prescribed, you're going to have them, and this is just a matter of form." Interestingly enough, Dr. Kowalski's name is signed to the document as a witness, but respondent

testified that Dr. Kowalski was not even in the room at the time she was induced to sign by Dr. Hendricks. The latter's name does not appear on the document. Dr. Kowalski testified, however, that the consent was signed in his presence. Respondent testified that she never consented to the treatments and that they were given to her against her will. This is partly corroborated by the sanitarium records. The official nurse's record for October 29th, just prior to the first shock treatment, reads in part: "Awake quiet talkative pleasant asks for tray states I'm not going to take the treatment anyway." The report continues that the treatment was then given with "persuasion."

The electric shock treatments, while frequently given in cases of some types of mental illness, are severe, cause temporary unconsciousness, and violent muscular spasms. Two attendants hold the patient during the treatment. After such treatments the patient is mentally confused for as much as two weeks.

Dr. Francis testified that by November 5, 1952, respondent was in excellent condition, cheerful, without depression or homicidal or suicidal tendencies. According to him, respondent was to have been released on November 5th but was not actually released until November 8th, when her sister arrived from Los Angeles.

Appellant testified that he sent one of his attorneys to the sanitarium, apparently on November 7th, to see respondent because there had been "some suggestion that I owed her some money and he was up there to see about a settlement in full." Appellant testified that he had been informed by Dr. Francis that respondent was then capable of transacting business. The attorney gave respondent a check for $1,200 in complete release of "any or all debts, obligations, claims, demands, liabilities and causes of action of whatsoever kind or description." Respondent admitted subsequently cashing the $1,200 check, admitted that the signature on the release was hers, but testified that she had no recollection at all of the transaction and certainly, at that time, did not realize that she had a cause of action for false imprisonment.

A few other pertinent facts should be mentioned. Admittedly, no incompetency or insanity proceedings were ever instituted against respondent. So far as the relationship between Dr. Francis and the sanitarium with appellant are concerned, admittedly appellant paid their bills. But Dr. Francis

162

testified that he accepted the case from Dr. Layton and not from appellant, and did not ever see appellant until after he had taken the case over; that "he thought" he did not speak to the appellant until October 25th, and did so again several days later, when appellant explained the background of the case to him. The two doctors denied that appellant ever requested that respondent be detained at the hospital or sanitarium against her will, and denied that they had ever been given any instructions for her treatment or care. Appellant admitted talking to Dr. Francis twice about respondent, and also admitted that he knew respondent had been transferred to the sanitarium, but made no inquiry about her willingness to be transferred, or about her treatment. He testified that he knew nothing about the shock treatments until after they were over.

Substantially on this evidence the jury returned a verdict against Cruickshank, Dr. Francis and the Alexander Sanitarium for $25,000 as compensatory damages. Charlotte Clapp Cruickshank, Dr. Layton and the Peninsula Community Hospital were exonerated from liability. As already pointed out, only Cruickshank appeals.

The basic contention of appellant is that the evidence is insufficient to support the judgment. Respondent contends that the evidence is sufficient to support a finding that Dr. Francis and the sanitarium and appellant conspired to falsely imprison her. This was the theory upon which the case was tried.

There can be no doubt that the evidence amply supports the implied finding that Dr. Francis and the sanitarium unlawfully imprisoned respondent. Her testimony that she was taken to the sanitarium without her consent and against her will alone supports such a finding. The peculiar circumstances under which the sanitarium secured respondent's "consent" to the shock treatments—giving her a sedative on October 26th; securing her consent after implying if not agreeing with the Webbs that no treatments would be given without their consent; telling the Webbs on October 28th that their protests were unavailing because shock treatments had already started when such treatments did not start until the next day; giving respondent the treatments over her objections as shown by the record, etc.—is corroborative of respondent. But to hold appellant as joint tort feasor with these two nonappealing defendants, since there is no evidence, other than payment of the fees, that he was a direct partici-

pant, there must be some evidence of a conspiracy. ■ Thus, the real question is not whether the evidence supports the finding that respondent was falsely imprisoned, but whether there is any substantial evidence to support the finding that appellant conspired with his two codefendants to falsely imprison respondent. To support this theory of conspiracy there must be evidence of (1) a concert of action between appellant and the nonappealing defendants to unlawfully detain respondent without her consent; (2) that appellant acted in furtherance of the common scheme or design to falsely imprison respondent; and (3) that appellant had knowledge of the conspiracy and its unlawful purpose. (*Neblett* v. *Elliott*, 46 Cal.App.2d 294 [115 P.2d 872]; *Alexander* v. *Hammarberg*, 103 Cal.App.2d 872 [230 P.2d 399]; *Wells* v. *Lloyd IV*, 6 Cal.2d 70 [56 P.2d 517].) ■ Of course, the agreement between conspirators need not be proved by direct evidence, but may be shown by circumstantial evidence that tends to show a common intent. (*People* v. *Yeager*, 194 Cal. 452 [229 P. 40]; *People* v. *Jordan*, 24 Cal.App.2d 39 [74 P.2d 519]; *People* v. *Montgomery*, 47 Cal.App.2d 1 [117 P.2d 437].) In fact, in the absence of a confession by one of the conspirators, it is usually very difficult to secure direct evidence of a conspiracy, so that in the usual case the ultimate fact of a conspiracy must be determined from those inferences naturally and properly to be drawn from those matters directly proved. (*Beeman* v. *Richardson*, 185 Cal. 280 [196 P. 774]; *Johnstone* v. *Morris*, 210 Cal. 580 [292 P. 970]; see also Restatement of Torts, sections 876(b) and 876(c), cited with approval in *Summers* v. *Tice*, 33 Cal.2d 80, 85 [199 P.2d 1, 5 A.L.R.2d 91].)

The problem with which we are faced is thus primarily a factual one. That is why the evidence has been reviewed at length. Since the jury has weighed this evidence and has found in favor of respondent, it is the duty of appellant to demonstrate that there is no evidence or no reasonable inference from the evidence that will support the finding that appellant conspired with the two nonappealing defendants against whom verdicts were rendered.

We agree with appellant that the existence of an unlawful imprisonment, and the conspiracy, or a common scheme or plan to accomplish such, must be found in the events starting with and subsequent to October 23, 1952, when Dr. Francis took over the case from Dr. Layton. This is so because the

jury exonerated Dr. Layton and the hospital. The jury must have found, therefore, either that respondent consented to go to the hospital, or that hospitalization, under the circumstances, was justified. (See *Vargas* v. *Giacosa*, 121 Cal.App. 2d 521 [263 P.2d 840].)

Starting with these sound premises appellant argues that the only evidence against him is that he paid all the bills. He argues that there is no evidence that he requested or directed Dr. Francis or the sanitarium to falsely imprison respondent, and that he did not see or talk with Dr. Francis until October 25th, several days after respondent had been taken to the sanitarium. He contends that the evidence shows that Dr. Francis was called into the case by Dr. Layton and not by appellant; that Dr. Francis did not consult appellant in making his diagnosis. Appellant denied authorizing or directing anyone to send respondent to the sanitarium. He urges that there is no evidence that when he paid the bills he knew that any of respondent's rights had been violated, and therefore no evidence that he encouraged or assisted Dr. Francis and the sanitarium with their unlawful acts. It is conceded that he never visited respondent at the hospital or sanitarium, and he claims that the evidence shows that he made no inquiry as to whether respondent wanted to go to the sanitarium or desired the shock treatments, although he did know that they had been prescribed. Appellant points out that if Dr. Francis had communicated with him about respondent's condition he would have violated the doctor-patient relationship. Based on these assertions, appellant argues that under these facts no reasonable mind could draw the inference that appellant had knowledge of any unlawful conduct on the part of Dr. Francis, the sanitarium, or anyone else. He asserts that any such inference necessarily would have to be based on mere suspicion and pure speculation.

Of course, findings may not be lawfully based on mere suspicion or speculation. (*Reese* v. *Smith*, 9 Cal.2d 324 [70 P.2d 933]; *Dobson* v. *Industrial Acc. Com.*, 114 Cal.App.2d 782 [251 P.2d 349]; *McKellar* v. *Pendergast*, 68 Cal.App.2d 485 [156 P.2d 950].) Appellant also properly points out that " 'If there be two inferences equally reasonable and equally susceptible of being drawn from the proved facts, the one favoring fair dealing and the other favoring corrupt practice, *it is the express duty of court or jury to draw the inference favorable to fair dealing.*' " (*Williams* v. *Spazier*,

134 Cal.App. 340, 349 [25 P.2d 851], quoting from *Ryder* v. *Bamberger*, 172 Cal. 791, 799 [158 P. 753].)

Appellant's interpretation of the evidence is a possible and reasonable interpretation, but it is not the only reasonable interpretation of that evidence. Appellant seems to be laboring under the impression that for respondent to prevail there must be evidence that on October 23d, when respondent was taken to the sanitarium, there was a conspiracy between appellant and the sanitarium and Dr. Francis to send her to the sanitarium. That is not the law. █ A conspirator who participates or cooperates unlawfully with other conspirators at any time during the conspiracy thereupon makes himself liable as a conspirator. (*People* v. *Mechler*, 75 Cal.App. 181 [242 P. 503] ; *People* v. *Kizer*, 22 Cal.App. 10 [133 P. 516, 521, 134 P. 346] ; *People* v. *Henderson*, 79 Cal.App.2d 94 [179 P.2d 406].)

From the record as a whole, and keeping in mind that the jury and the trial judge saw and heard these witnesses and properly passed on their credibility, it is a reasonable inference that at least when appellant paid the bills he knew respondent was being confined to the sanitarium and receiving shock treatments without her consent. Although there is no direct evidence of an unlawful agreement between appellant and Dr. Francis, there is evidence of at least two conversations between them, the first at least as early as October 25th, in which the history and background of the case, appellant's version of the relationship between appellant and respondent, and the payment of all the bills, including those of Dr. Francis and the sanitarium (the latter's bill including the shock treatments) were discussed. Admittedly, appellant then learned that respondent had been transferred to the sanitarium and that shock treatments had been prescribed. Some significance must be given to Mrs. Webb's testimony that Dr. Francis told her in the evening of October 25th that he was sure the disturbance of the 21st was not on the police records and he thought that appellant had taken care of it. It was also on the 25th, after Dr. Francis had talked to appellant, that he refused to let Mrs. Webb take respondent home. On the 26th the sanitarium sought Mrs. Webb's consent to the shock treatments and certainly implied, if it was not stated, that the shock treatments would not be given until Mrs. Webb communicated with the sanitarium. Yet within a few hours of Mrs. Webb's departure, respondent's "consent" was secured to the treatments under questionable

and highly suspicious circumstances. Why? On the 28th when Mrs. Webb telephoned and refused her consent, Dr. Francis was "indignant" and told her that the treatments had actually started on the 26th, when in fact they were not started until the 29th. Why? It is also significant that before respondent had left the sanitarium appellant sent one of his attorneys to see respondent to induce her to sign a release of "all claims," at a time that she testified that she could not remember the transaction at all, apparently still being in the confused state caused by the shock treatments.

Both appellant and Dr. Francis pleaded this release as an affirmative defense. Is it reasonable to imply that this incident was planned by appellant and Dr. Francis? In addition to the payment of the bills, the record, already reviewed, shows a motive on the part of appellant to have respondent restrained. In other words, with the background here existing, it is not wholly unreasonable to infer that appellant wanted respondent restrained. It is not entirely unreasonable, from what happened before and after Dr. Francis took respondent to the sanitarium, to infer that appellant and Dr. Francis did more than merely discuss the case generally and discuss the bills, and actually reached an express or tacit understanding as to the restraint and treatment of respondent. The fact that Dr. Francis refused to turn respondent over to Mrs. Webb, the hasty and questionable method of securing respondent's "consent" to the shock treatments, the giving of such treatments without Mrs. Webb's consent, in fact, over her disapproval, and the securing of the release of "all claims" all indicate a guilty knowledge and concert of action between the parties. Giving respondent's testimony that the release was secured from her under the circumstances testified to by her the weight to which it is entitled, it is reasonable to infer that there must have been communication between appellant and Dr. Francis to the effect that such a release could and should be secured for their mutual benefit before respondent left the sanitarium and that Dr. Francis would arrange to have respondent in such a condition that she would not know what she was signing. Appellant's testimony that the purpose of the release was merely to settle respondent's claim for money due for her past services was discredited by the fact that both appellant and Dr. Francis pleaded the release as an affirmative defense to this action for false imprisonment.

Thus, the evidence is sufficient to sustain the implied find-

ing of the jury that appellant either conspired with Dr. Francis to restrain, unlawfully, the respondent, or that at the time he agreed to pay Dr. Francis and the sanitarium for their services he knew that respondent was being confined and receiving shock treatments without her consent, thereby encouraging and participating and making possible her unlawful confinement.

The next contentions of appellant relate to the instructions. Appellant proffered instructions to the effect that the mere fact of payment of the bills did not constitute the receiver of the money an agent of the payer; that appellant was not liable for the acts of an independent contractor unless the jury found that appellant and the independent contractor were joint tort feasors; and that even if the jury found that the doctors were the agents of appellant their knowledge was not imputable to appellant because it would be in violation of the doctor-patient privilege. It is urged that, without such instructions, the jury might have found that appellant was responsible under the doctrine of *respondeat superior*.

The contention is unsound. The case was not pleaded or tried on any theory of *respondeat superior*. The complaint alleged a cause of action against the defendants for false imprisonment on the theory that they were joint tort feasors. Conspiracy was not alleged, but such allegation was not necessary. ▮ Conspiracy can be proved without such an averment, and, even if averred, need not be proved, because the gist of the action is the wrong done and not the conspiracy. (*Loeb* v. *Kimmerle*, 215 Cal. 143 [9 P.2d 199].) The case was tried on the theory that defendants, as conspirators, were joint tort feasors. The court properly instructed on joint tort liability and on conspiracy. While it is true that agency could have been embraced within the allegations of the complaint, since an allegation that an act was committed by a principal includes an allegation that it was committed through an agent without an allegation of agency (*Hahn* v. *Hahn*, 123 Cal.App.2d 97 [266 P.2d 519]; *Hirsch* v. *Rand*, 39 Cal. 315), the fact is that no evidence of agency was offered by respondent. Appellant as a defendant sought to inject this theory into the case for the first time when he proffered instructions on the doctrine. In other words, although respondent as plaintiff had not pleaded or offered evidence on the doctrine, and offered no instructions on it, appellant claims the right to set up this theory simply for the purpose of showing it was not applicable, although

no one was claiming it was applicable. ▮ While a defendant is entitled to instructions on any applicable theory of defense, he is not entitled to instructions setting forth a defense to a cause of action not relied upon in any way by the plaintiff. What appellant is really contending is that the jury, without evidence or instructions on agency, may have imposed liability on that theory. This would require us to hold that the jury completely disregarded the instructions that to hold appellant liable the jury must find that he was a conspirator or a joint tort feasor. This we are not permitted to do. Under the circumstances, it would have been error to have given the requested instructions.

▮ The appellant also complains of one of the instructions given on the issue of conspiracy. After correctly instructing that ''it is the alleged unlawful imprisonment and not the conspiracy which forms the basis of plaintiff's complaint'' the court gave this instruction:

''In an action for damages for false imprisonment resulting from the acts of conspirators, the major significance of a conspiracy lies in the fact that it renders each defendant who conspires jointly liable for all the damages ensuing from the alleged unlawful imprisonment, irrespective of whether or not the defendants or any of them caused such imprisonment, and regardless of their respective degree of activity or participation in the commission of the alleged wrongful act of false imprisonment.'' Appellant complains that this instruction is improper because, so he claims, the jury was told by it that they might find the conspirators liable even though none of the coconspirators actually committed the offense, and even though the basis of the cause of action is the false imprisonment and not the conspiracy.

The instruction embodied several correct principles of law. ▮ It is well settled that a conspirator is liable for all the acts done in furtherance of a common scheme or plan even though he is not a direct actor. (*Leavitt* v. *Gibson*, 3 Cal.2d 90 [43 P.2d 1091] ; *Mox, Inc.* v. *Woods*, 202 Cal. 675 [262 P. 302].) ▮ It is equally well settled that a party may be liable even if the intentional tort is commenced before he participates, if he, knowing the facts, then participates therein. (*People* v. *Mechler*, 75 Cal.App. 181 [242 P. 503] ; *People* v. *Kizer*, 22 Cal.App. 10 [133 P. 516, 521, 134 P. 346] ; *People* v. *Henderson*, 79 Cal.App.2d 94 [179 P.2d 406].) In such a case it is obvious that the conspirator entering

the conspiracy after it started did not "cause" the alleged wrong, because it had already commenced.

It must also be remembered that the jury had before it six defendants. Various combinations of those defendants were possible. The jury actually exonerated three of the defendants, thus finding that these three did not conspire to imprison respondent. It was proper to instruct on these various possibilities. The jury might have found that the conspiracy was between Dr. Francis and appellant but not involving the sanitarium. In such event the sanitarium would have been the direct actor in imprisoning respondent. Appellant and Dr. Francis would still be liable even though neither was a direct actor in the imprisonment. In other words, if two or three parties enter into a conspiracy to imprison a certain person and prevail upon X, who is ignorant of the conspirator's plan and design, to do the actual act of falsely imprisoning that person, the conspirators are jointly and severally liable even though none of them actually participates in the physical act of imprisoning the one who complains. Thus, the instruction was correct.

Appellant complains of the failure to give several proffered instructions which, taken together, would have told the jury that participation in a common plan or scheme to be actionable had to be for the purpose of falsely imprisoning respondent. The instructions would have told the jury that to hold any defendant liable the jury must find that he "not only acted in concert with some other defendant . . . with a unity of purpose or design . . . but that the purpose or design was to falsely imprison the plaintiff," and that while payment of the bills by appellant was some evidence that he wanted respondent to receive such medical and hospital care needed by her, to hold appellant responsible the jury must find that such payment was "accomplished with a unity of purpose or design with some other defendant or defendants acting in concert each with the knowledge and consent of the other or others to deprive plaintiff of her liberty without her consent."

Appellant contends that the refusal of these instructions resulted in the failure on the part of the court to instruct the jury that the participation in the common plan or design had to be to effect the unlawful imprisonment of respondent and not merely to provide medical care for respondent, which, by itself, would be innocent.

The proffered instructions undoubtedly embody a correct

statement of law applicable to the facts of the instant case. It is also true that the court did not expressly tell the jury that the participation in the joint plan had to be for the purpose of falsely imprisoning respondent, and that mere participation in an agreement to provide hospitalization and treatment was not enough to hold appellant responsible. Thus, it would have been quite proper for the trial judge to have given the *proffered instructions.* But failure to do so was not prejudicial error. All the refused instructions would have told the jury was that the only cause of action involved was one for false imprisonment; that to recover, respondent must show that appellant conspired to falsely imprison her; and that the mere fact that appellant may have conspired for some other purpose was not enough. The basic charge to the jury expressed this thought time and time again. Thus, the jury was told that the cause of action involved was one for false imprisonment; that if the defendants "conspired to unlawfully imprison the plaintiff, then I instruct it is the alleged unlawful imprisonment and not the conspiracy which forms the basis of plaintiff's complaint"; and that the conspiracy was important only in that it made all participants liable for the false imprisonment. False imprisonment was the only offense defined, and it was defined at length and correctly, both affirmatively and negatively. The jury was also told that mere payment of the doctor and hospital bills did not alone make appellant liable. Later, after fully defining false imprisonment and conspiracy, the court instructed: "All who take part or assist in the commission of a false imprisonment are joint tort feasors," but to render any person liable for such offense which is actually committed by another, the plaintiff must prove "One, a concert of action; two, a unity of purpose or design; and, three, two or more defendants working separately but to a common purpose, each acting with the knowledge and consent of the others." Many other instructions could be referred to to demonstrate that the jury was told directly and indirectly, many times, that for plaintiff to hold appellant she must prove that she was falsely imprisoned by him or that he conspired to so imprison her. Thus, while the jury was not told, in so many words, that the unity of design had to be to effect the unlawful imprisonment of respondent and not merely to effect her care and treatment, it is quite clear that the jury could not possibly have believed, from the instructions that mere participation in the hospitalization

and care of respondent by payment of the bills was sufficient to impose liability on appellant. Such belief would be in direct violation of the basic theory of the instructions which clearly and unequivocally told the jury that to hold appellant responsible his participation, if any, had to be done with the intent and purpose of falsely imprisoning respondent.

The trial court in the course of its instructions, read several sections of the Welfare and Institutions Code relating to the circumstances under which a mentally ill person may be placed under restraint in a public or private hospital. Appellant complains particularly about the reading to the jury section 5050.3 of the Welfare and Institutions Code, contending there was no evidence justifying the giving of that instruction, that it conflicts with other instructions, and that it was calculated to, and in fact did, mislead the jury.

In order to understand these contentions some reference must be made to the instructions. The major issues at the trial on which there was a conflict of evidence was whether respondent had or had not consented to go to the hospital and sanitarium. The court instructed on this issue at some length. It first instructed that every person over 21 presumably has the mental capacity to give consent; that "a mentally ill person may be lawfully restrained of his or her liberty when, under all the circumstances existing at the time of the restraint, there is reasonable grounds to believe that not to restrain would endanger the life of the person restrained or the lives of others, and such restraint may be continued for so long as there is reasonable ground to believe that such danger continues"; that plaintiff must prove that she was detained against her will and that such detention was unlawful; that a person is not unlawfully detained if she consents or if there is justification therefor; that detention is justified if, in the absence of detention, the person detained would endanger her own life or that of others; and that such restraint may be continued for so long as there is reasonable grounds to believe such danger continues.

Then, after these general instructions, the court stated that it would now read several sections of the Welfare and Institutions Code referred to by the attorneys in their arguments. The court first read section 5040 of the code defining "mentally ill" persons as those "in need of supervision, treatment, care, or restraint" or who are dangerous to themselves or others. Then, stating that the section "is a permissive statute" the court read section 5750 of that code. The

section prohibits the commitment of any person without a physician's approval. It provides:

"No person, except one who voluntarily desires and seeks admission as a patient, shall be committed or taken by any person to a private psychopathic institution, hospital, sanitarium, department, or ward for the care or treatment of persons who are mentally ill or deranged, without a written statement from at least one licensed physician, who has no financial interest in nor membership on the paid regular or consultant staff of such private psychopathic institution, hospital, sanitarium, department, or ward, that he has made a mental examination of the patient and that the patient should be admitted to such place for care or treatment."

The court then gave an instruction embodying portions of section 5050.3 of the Welfare and Institutions Code. The instruction reads as follows:

" 'When any person becomes so mentally ill as to be likely to cause injury to himself or others and to require immediate care, treatment, or restraint, a peace officer or health officer, who has reasonable cause to believe that such is the case, may take the person into custody for his best interest and protection' and detain such person in quarters provided in any county hospital or state hospital upon written application by such peace officer or health officer.

" 'The superintendent or physician in charge of the quarters provided in such county hospital or state hospital may care for and treat the person for a period not to exceed seventy-two (72) hours. Within said seventy-two (72) hours the person shall be discharged from the institution unless a petition of mental illness is presented to a judge of the superior court and the court issues an order for detention of such person, or unless the person is admitted as a patient under any other provision of law.' "

Four and a half hours after the jury had retired it came in and requested answers to the following questions:

"How many circumstances are there under which a person may be a patient in a mental sanitarium?"

"What procedures must be followed in each of these circumstances?"

A juror called the court's attention to section 5750. The court said: "That, I informed you, was a permissive statute. What I mean by that is that it is not the only method necessarily." The court then reread section 5750, and summraized a portion of section 5050.3, referring to it as being "merely per-

missive also," and without reading the 72-hour provision, and then stated: "In addition to this procedure, any person, relative or otherwise, may sign a petition in this Court to have an examination of a person who is mentally ill. I am sorry I cannot elaborate much upon the subject." The court then read one of the instructions on express and implied consent which clearly pointed out that the "detention of a person in a hospital with his consent is not unlawful."

One of the jurors then pointed out that the jury wanted to know about a person being taken into a hospital for a temporary period for an examination, and asked: "How long can that hospital keep them there?" The court then stated: "That is a period of 72 hours."

It is contended by appellant that the instructions dealing with section 5050.3 should not have been given because there was no evidence to support them, that they conflicted with other instructions given on the lawful period of detention of a mentally ill person, and therefore must have misled the jury. It is urged that section 5050.3 is inapplicable to the facts of the case because there is no evidence that respondent was ever taken into custody by any public official or detained in any public hospital. The 72-hour provision of this section must have misled the jury, so it is claimed, because of the insistence of the jury upon having that portion of the section reread.

No doubt the instructions may not have all been consistent. The jury was first told that a mentally ill person may be lawfully restrained when there is reasonable grounds to believe that unrestrained he is a danger to himself or others and that "such restraint may be continued for so long as there is reasonable ground to believe that such danger continues." Then the court quoted section 5750 showing how a person without consent may be committed to a private institution, and section 5050.3 how such a person may be committed to a public institution. The last section contains the 72-hour limitation. It may be that the jury could have believed that the 72-hour limitation applied to commitments without consent to private as well as public institutions. We express no opinion as to the correctness of such belief, because it is not necessary to decide that point in this case. Assuming that the 72-hour limitation does not apply to section 5750, appellant could not possibly have been prejudiced by even an assumed erroneous instruction to the effect that it does. This is so because the evidence is uncontradicted that in the instant

case neither section was followed. Section 5750 relating to commitments to private institutions by private physicians, in the absence of consent, requires a written statement from a qualified physician that he has examined the patient. Appellant conceded on the oral argument that there was not compliance with this section. In his brief (App.Op.Br. p. 90) appellant concedes that the uncontradicted evidence is that respondent was admitted to the sanitarium "on oral instructions given by the private physician on the telephone." It is equally clear that section 5050.3 was not complied with because respondent was not sent to a public institution. Thus, appellant must and does contend that the instruction on section 5050.3 conflicted with "consent" instructions, and must have led the jury to believe that even with consent the 72-hour provision was applicable. This contention is clearly unsound. A reading of the many instructions on consent, including the one given the second time when the jury asked for help, clearly and without ambiguity told the jury that if the respondent consented to go to the sanitarium she had not established a case of false imprisonment. The jury was told time and time again that consent, without limitation and until withdrawn, was a complete and absolute defense. This was the basic factual issue at the trial. Any confusion between sections 5750 and 5050.3, or any conflict between them, assuming one exists, could not possibly have affected that basic issue.

The last contention of appellant is that the $25,000 verdict must have been based on passion and prejudice, and is therefore excessive. The point requires scant consideration. Accepting respondent's testimony as we must, she was confined illegally for over two weeks, was given seven shock treatments without a lawful consent, suffered a severe injury to her nerves and to the muscles of her back which prevented her from turning over in bed or walking straight, holding her head up or from sitting down, lost a tooth, got a painful abscess on her hip, suffered humiliation and embarrassment, and was confused and nervous for three months. Under such circumstances we cannot say, as a matter of law, that the verdict was excessive.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied September 21, 1956.